Carole Vigne (SBN 251829)
Mana Barari (SBN 275328)
LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
180 Montgomery Street, Suite 600
San Francisco, CA  94104
Telephone:      (415) 864-8848
Facsimile:      (415) 593-0096
Email:           cvigne@las-elc.org
                    mbarari@las-elc.org

Agnieszka Fryszman, *pro hac vice application forthcoming*
COHEN MILSTEIN SELLERS & TOLL PLLC
1100 New York Ave., N.W.
East Tower, Suite 500
Washington, District of Columbia  20005
Telephone:      (202) 408-4600
Facsimile:      (202) 408-4699
Email:           afryszman@cohenmilstein.com

Yenny Teng-Lee (SBN 297021)
THE LAW OFFICE OF YENNY TENG-LEE
1630 S Delaware St., No. 25414
San Mateo, CA 94402
Telephone:      (650) 619-0042
Email:           yenny@teng-leelaw.com

*Attorneys for Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SORIHIN, aka SORIHIN SORIHIN, an individual; and ABDUL FATAH, an individual, <br><br>     Plaintiffs, <br><br>   v. <br><br> THOAI VAN NGUYEN, an individual doing business as SEA QUEEN II, <br><br>     Defendant. | Case No:  16-5422 <br><br> **COMPLAINT FOR DAMAGES FOR HUMAN LABOR TRAFFICKING** <br><br> <u>**JURY TRIAL DEMANDED**</u> |

Case No.:

COMPLAINT

**COMPLAINT**

Plaintiffs Sorihin, aka Sorihin Sorihin, and Abdul Fatah (jointly, "Plaintiffs"), bring this action against Defendant Thoai Van Nguyen, individually and doing business as the Sea Queen II. Plaintiffs allege as follows:

**INTRODUCTION**

1.    This is an action brought by survivors of human trafficking.  Plaintiffs were recruited to work in the commercial fishing industry.  Instead of the promised job at the promised wage on the promised vessel, the men were taken to sea and transferred against their will while in the middle of the Pacific Ocean to Defendant Nguyen's fishing vessel, the Sea Queen II.  On the Sea Queen II, Plaintiffs were subjected to forced labor, fishing for tuna, swordfish, and other seafood, for up to 20 hours per day; denied medical treatment; and paid less than promised in their written contract. Plaintiffs' requests for help led nowhere.  Plaintiffs eventually were able to escape when the Sea Queen II docked in San Francisco, California in April 2010.

2.    Defendant Nguyen is domiciled in San Jose, California.

3.    This case arises under the Trafficking Victims Protection Act, 18 U.S.C. § 1595, and other applicable laws.

4.    A long series of media, government, and NGO investigations have drawn attention to the high prevalence of forced labor on fishing boats around the world.  The United States Department of State, the International Labor Organization, the Government of New Zealand, and most recently the Associated Press, among others, have documented that to cut costs, unscrupulous fishing vessel owners rely on foreign recruiters to seek out vulnerable individuals in need of work and to lure them with promises of good jobs.  Like Plaintiffs here, these victims are then transferred to fishing vessels where they face physically grueling work, malnourishment, and abuse on a daily basis.  Moreover, once the victims are shipped out to sea, they are trapped, and escape is almost impossible.  Plaintiffs here were victims of a near identical scheme.

///
///
///

COMPLAINT

**PARTIES**

*Plaintiffs*

5.      Plaintiff Sorihin is an Indonesian citizen who now resides in the United States. Plaintiff Sorihin was recruited to work in the commercial fishing industry but was instead trafficked onto the Sea Queen II.   Plaintiff Sorihin finally escaped while the Sea Queen II was docked in San Francisco in April 2010.  He currently resides and works in this District.

6.      Plaintiff Fatah is an Indonesian citizen who now resides in the United States. Plaintiff Fatah was recruited to work in the commercial fishing industry but was instead trafficked onto the Sea Queen II.  Plaintiff Fatah finally escaped while the Sea Queen II was docked in San Francisco in April 2010.  He currently resides and works in this District.

*Defendant*

7.      Defendant Nguyen is a U.S. citizen and a resident of San Jose, California.  At all relevant times herein, Defendant Nguyen was the owner and captain of the commercial fishing vessel the Sea Queen II (U.S. Coast Guard Documentation Number 939008), to which Plaintiffs were transferred against their will and forced to labor.  Defendant Nguyen does business as the Sea Queen II, which is registered as a fictitious business name in Santa Clara County, California to Defendant Nguyen.

**RELEVANT NON-PARTIES**

8.      Hernan Santiago ("Santiago") is an individual residing in Honolulu, Hawaii.  At all relevant times herein, Santiago was engaged in the business of recruiting foreign crewmembers to work on fishing vessels in the United States, including in California.  Santiago has conducted business using the fictitious business name World Agent Enterprises aka World Agent Enterprises, Inc., and entered into employment contracts relevant to this Complaint under that fictitious business name with Plaintiffs.

9.      Upon information and belief, PT Shilla is an Indonesian corporation with its offices located in Jakarta, Indonesia.  Upon information and belief, PT Shilla recruited crewmembers in Indonesia as part of the trafficking scheme alleged herein.

*///*

Case No.:

COMPLAINT

10.    Quan Do ("Do") is an individual residing in Honolulu, Hawaii. Upon information and belief, at all relevant times herein, Do was the captain of the Knowledge, the commercial fishing vessel which transported Plaintiffs from American Samoa to meet the Sea Queen II at sea.

11.    The Knowledge is a fishing vessel which transported Plaintiffs from American Samoa to the Sea Queen II at sea. Upon information and belief, at all relevant times herein, the Knowledge was owned by F/V Knowledge, Inc. Additionally, upon information and belief, at all relevant times herein, F/V Knowledge, Inc. was a company registered in the state of Hawaii with its offices located in Honolulu, Hawaii. Upon information and belief, Do was the agent for service and the President and Director of F/V Knowledge, Inc.

## JURISDICTION AND VENUE

12.    The jurisdiction of this Court is invoked pursuant to: 28 U.S.C. § 1331, this action involving questions of federal law; 18 U.S.C. § 1596, this action involving an offense under the federal Trafficking Victims Protection Act, 18 U.S.C. §§ 1589, *et seq*. and the offender is a national of the United States or present in the United States, irrespective of nationality; and 28 U.S.C. § 1350, this action involving a civil action by an alien for a tort in violation of the law of nations and treaties of the United States.

13.    This Court has personal jurisdiction over Defendant Nguyen as an individual because Defendant Nguyen is domiciled in San Jose, California (Santa Clara County). This Court further has personal jurisdiction over Defendant Nguyen d/b/a the Sea Queen II pursuant to California Code of Civil Procedure section 410.10. The Sea Queen II has constant and pervasive contacts in California, so as to render it essentially at home in California. The Sea Queen II regularly docks in San Francisco, California to engage in commercial activities, and thus has substantial, continuous and systematic business contacts within California. Further, the Sea Queen II is registered as a fictitious business name in Santa Clara County, California, with a business address in San Jose, California. Because the Sea Queen II has purposefully availed itself of the privileges of conducting activities in California, and because a substantial portion of the events or omissions underlying Plaintiffs' claims occurred either in California or to secure labor for the Sea Queen II's commercial fishing activities

///

within California, the exercise of personal jurisdiction over Defendant Nguyen d/b/a the Sea Queen II is reasonable.

14.    Venue is proper in this District under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claims occurred in this District, and under 28 U.S.C. § 1391(b)(2)(3), because Defendant Nguyen is subject to this Court's personal jurisdiction with respect to this action.

15.    Assignment of this action to the San Francisco Division of this Court is proper under Local Rule 3-2(c) and (d) because a substantial part of the events or omissions giving rise to the claims occurred in the City and County of San Francisco.

## STATEMENT OF FACTS

**The Global Human Trafficking Epidemic**

16.    Trafficking in human beings is a growing scourge around the world.  The United States government estimates that there are currently more than 20 million victims of human trafficking.[1]

17.    Human traffickers prey on the most vulnerable members of society.  Traffickers often trick, coerce, or win the confidence of their victims through promises of a better life,[2] frequently using "bait-and-switch scenarios."[3]

18.    Human trafficking is a profitable and prolific clandestine criminal enterprise operating underground in every country across the globe, producing an estimated USD 150 billion in profits each year for traffickers.[4]  The use of trafficked labor reduces costs and increases profit margins.

///

---

[1] U.S. Dep't of State, Trafficking in Persons Report 45 (2012) (hereinafter "TIP 2012") (estimate of modern slavery worldwide increased from 12.3 million victims in 2005 to 20.9 million victims in 2012).

[2] U.S. Dep't of State, Trafficking in Persons Report 8 (2009).

[3] U.S. Dep't of State, Trafficking in Persons Report 27 (2011).

[4] Int'L Labour Org. (ILO), *Profits and Poverty: The Economics of Forced Labor*, 22 (2014), *available at http://www.ilo.org/wcmsp5/groups/public/---ed_norm/---declaration/documents/publication/wcms_243391.pdf.*

COMPLAINT

19.    In an early effort to combat human trafficking domestically and abroad, Congress passed and repeatedly reauthorized the Trafficking Victims Protection Act.

20.    The Trafficking Victims Protection Reauthorization Act of 2003 (TVPRA) authorizes victims of human trafficking to file a civil action against any perpetrator or whoever knowingly benefits, financially or by receiving anything of value, from participation in a venture which that person knew or should have known was engaged in slavery, peonage, forced labor, involuntary servitude, unlawful conduct with respect to documents, and human trafficking.  The United States' commitment to prioritize anti-trafficking efforts is also manifest in its decision to become party to the United Nations' Protocol to Prevent, Suppress and Punish Trafficking in Persons, along with 163 other nations.

**Forced Labor on Fishing Vessels Is a Growing Problem**

21.    According to a 2011 United Nations report, employment in the fishing industry is one of the fastest growing employment sectors of traditional forms of agriculture worldwide.  In 2008, there were 44.9 million people employed globally by the fishing industry.  In 2009, there were 145 million tons of fish harvested.[5]

22.    Each year, the United States Department of State compiles a Trafficking in Persons Report with data from U.S. embassies, government officials, organizations, and news sources worldwide.[6]  The Trafficking in Persons Report has repeatedly focused on the problem of human trafficking and forced labor on commercial fishing vessels.

23.    In its 2012 Trafficking in Persons Report, the United States Department of State observed, "A series of media, government, and NGO investigations have drawn attention to the high prevalence of forced labor on fishing boats around the world."[7]  The report noted that "For years, the fishing industry has targeted vulnerable populations" and provided this example: "an Indonesian

---

[5] United National Office On Drugs And Crime, *Transnational Organized Crime In The Fishing Industry*, 13, 15 (2011) (hereinafter "UNODC Report"), *available at* http://www.unodc.org/documents/human-trafficking/Issue_Paper_-_TOC_in_the_Fishing_Industry.pdf.

[6] U.S. Dep't of State, Trafficking in Persons Report 39 (June 2016).

[7] TIP Report 2012 at 38.

recruiter persuades a worker in his home country to sign a contract to work aboard one of the vessels.  Once on the boats, some victims are forced by senior crew employed by fishing corporations to work 18 or more hours per day, threatened, prevented from leaving the boat, and in some instances were exposed to physical abuse…"[8]

24.     An analysis by the International Labour Organization (ILO) reports that migrant workers from developing states are increasingly used to crew fishing vessels.[9]  Long-distance fishing is labor intensive and crew wages can account for between 30 and 50 percent of operating costs.[10]  The use of low-wage migrant workers can cut these costs considerably and give fishing operators a competitive advantage.  As a result, trafficking and forced labor are becoming increasingly common in the fishing industry.

25.     The ILO found that "migrant workers in particular are too often deceived and coerced by brokers and recruitment agencies and forced to work on board vessels under the threat of force or by means of debt bondage" and that "the recruitment process in which migrant labourers are sourced by recruitment agencies in one jurisdiction and employed by fishing operators in another, means that fishers can easily be deceived by these agencies or by fishing operators when embarking the fishing vessel and can be coerced into accepting employment contracts or agreements on lesser terms than initially discussed."[11]

26.     Fishing boat workers are particularly vulnerable to coercive practices because the fishing fleet can stay in remote areas of the sea.  Due to the rising prices of fuel and diminished populations of fish near shore, many fishing vessels have increased long-haul fishing practices, moving operations farther out from shore and increasing the amount of time that boats are at sea.[12]  Human trafficking and forced labor can covertly take place on fishing vessels "because of the

---

[8] *Id.*

[9] International Labour Organization. *Caught At Sea: Forced Labor And Trafficking In Fisheries*, 5 (2013).

[10] *Id.*

[11] *Id.* at v & 16.

[12] Ian Urbina, 'Sea Slaves': The Human Misery that Feeds Pets and Livestock, *The New York Times*, July 27, 2015.

COMPLAINT

isolation of the workplace."[13]  In addition, the ILO found that the confiscation of identity documents and restrictions on movement in foreign ports prevents victims from seeking assistance and protection from government officials.[14]

27.     Living conditions aboard fishing vessels are abysmal.  According to a United Nations study published in 2011, workers are packed into small cabins and experience intense exposure to sun and seawater throughout the day.  Additionally, unhygienic cooking facilities and limited food supplies contribute to poor health and malnourishment.[15]

**Indonesia Is a Major Source for Trafficked Labor in the Fishing Industry**

28.     Indonesia is an emerging market economy in Southeast Asia and the fourth most populous country in the world.[16]

29.     Indonesia is a major source country for human traffickers.[17]  The Indonesian government estimates that 6.2 million Indonesians are migrant workers, employed abroad in a number of industries including the fishing industry.[18]  In 2015, the Indonesian government reported an increase in Indonesian fishermen subjected to forced labor and the United States Department of State concluded that a significant number of Indonesian migrant workers face conditions of forced labor, including through debt bondage, on fishing vessels operating in international waters.[19]

30.     The United States Secretary of State has specifically identified this pattern of unethical recruitment and abuse in the fishing industry as human trafficking.[20]  Members of

---

[13] *Id.*

[14] International Labour Organization. *Caught At Sea: Forced Labor And Trafficking In Fisheries*, 1, 15 (2013).

[15] UNODC Report at 28.

[16] United States Census Bureau, International Database (IDB); Countries and Areas Ranked by Population 2010 (http://sasweb.ssd.census.gov/cgi-bin/broker).

[17] U.S. Dep't of State, Trafficking in Persons Report 187 (2015).

[18] *Id.*

[19] *Id.*

[20] *Id.*

COMPLAINT

1    Congress have characterized the human trafficking in the Southeast Asian fishing industry "a real-

2    life horror story."[21]

3        31.    In 2009, when Plaintiffs were recruited, an estimated 50% of the population in

4    Indonesia lived on less than USD 2 per day, and the per capita GDP was estimated to be USD 2,263.

5    The same year, remittances into Indonesia by foreign laborers reached USD 6.6 billion.[22]  Working

6    abroad is one of very few ways that Indonesians, particularly those from rural areas (such as

7    Plaintiffs), can have the opportunity to support themselves and their families through stable work.

8    Recognizing this demand, foreign recruitment agencies are a commonplace business venture in

9    Indonesia.[23]

10   **Plaintiffs Are Recruited in Indonesia to Work as Tuna Fishermen on the Knowledge**

11       32.    PT Shilla is one such recruitment agency located in Jakarta, the capital of Indonesia.

12   Upon information and belief, PT Shilla acted as an agent and/or on behalf of Santiago, d/b/a World

13   Agent Enterprises aka World Agent Enterprises, Inc., to recruit fishermen to work on U.S. fishing

14   vessels, including the Sea Queen II.

15       33.    Santiago is a self-identified "middle man," who receives a cut of the recruitment fees

16   paid by foreign fisherman, like Plaintiffs, and commission for each crew member he supplies to U.S.

17   fishing vessels.

18       34.    Defendant Nguyen owns and operates the Sea Queen II as a commercial fishing

19   vessel.

20       35.    Upon information and belief, Defendant Nguyen contacted Santiago in 2009 because

21   he was seeking cheap labor to work on board the Sea Queen II, and Santiago was a known supplier

22   of cheap foreign labor to work on fishing vessels.

23

24       [21] Esther Htusan & Margie Mason, *More Than 2,000 Enslaved Fishermen Rescued in 6 Months*

25   *AP Explore: Seafood from Slaves* (2015), http://www.ap.org/explore/seafood-from-slaves/more-
     than-2,000-enslaved-fishermen-rescued-in-6-months.html (last visited Jun. 24, 2016).

26       [22] International Organization for Migration, *International Migration and Migrant Workers'*

27   *Remittances in Indonesia*, 8 (2010) *available at:*
     http://publications.iom.int/system/files/pdf/indonesia_remittances.pdf.

28       [23] *Id.*

COMPLAINT

36.    Plaintiff Sorihin is an experienced fisherman who had worked for several years on Japanese fishing vessels.  In approximately summer 2008, Plaintiff Sorihin returned to Indonesia for an extended stay with his wife and newborn baby after completing a one-year contract with a Japanese fishing vessel.  Because he took an extended break, Plaintiff Sorihin could not return to his position on the Japanese fishing vessel and struggled to find part-time or temporary contract positions, which paid far less than his work as a fisherman.

37.    Plaintiff Sorihin was desperate to find decent and stable work to support his new family.

38.    In approximately May 2009, Plaintiff Sorihin went to the PT Shilla office in Jakarta and applied for a job.

39.    In approximately July 2009, PT Shilla called Plaintiff Sorihin to inform him of an opportunity to depart the following month to work on an American fishing vessel.  The following day, Plaintiff Sorihin went to the PT Shilla office in Jakarta to discuss the details of the position.   A representative of PT Shilla met with him and, for the first time, informed him that he would be charged a recruitment fee of IDR 3 million (approximately USD 319).[24]  The representative said the recruitment fee was for the broker in Hawaii.  Plaintiff Sorihin was surprised by this news, as he had never previously paid recruitment fees to work on Japanese fishing vessels.  In return, PT Shilla promised Plaintiff Sorihin a two-year contract whereby he would earn USD 350 per month in the first year and USD 400 in the second year as a tuna fisherman, plus a bonus of USD 10 per ton per trip of fish caught.  Based on his experience working on Japanese vessels, Plaintiff Sorihin calculated that he could nearly double the base salary based on the guaranteed per ton bonus portion of his compensation.  PT Shilla also informed Plaintiff Sorihin that he would receive a USD 100 per month premium for working in cold weather.  Further, PT Shilla advised him that he would be assigned specific additional duties on board, which would also allow him to earn an additional monthly premium (a practice that was also common on Japanese vessels).

---

[24] In 2009, USD 1 equaled approximately IDR 9400.  All conversions are calculated based on this 2009 exchange rate.

COMPLAINT

40.     Interested in the prospect of earning a decent and stable income, Plaintiff Sorihin decided to pay the recruitment fee and take the position through PT Shilla.  Plaintiff Sorihin calculated that the promised wages and guaranteed bonus payment would make the recruitment fee worthwhile and allow him to better support his family.

41.     Shortly after this meeting, PT Shilla called Plaintiff Sorihin and told him he would be departing in two to three weeks, but first needed to pay the recruitment fee.  As he did not possess the large sum of IDR 3 million, he requested a loan from his mother-in-law.  Plaintiff Sorihin had never borrowed money from his in-laws before and was very embarrassed to do so, but he had no other option.  In mid-August 2009, he paid the IDR 3 million recruitment fee to PT Shilla.  PT Shilla informed Plaintiff Sorihin that he would be departing on approximately August 17, 2009.

42.     Similarly, Plaintiff Fatah was interested in becoming a commercial fisherman in order to escape the poverty and lack of decent job opportunities he faced in Western Java.  Years earlier Plaintiff Fatah completed a three-month training program on board an Indonesian fishing vessel, and received his Seaman's book.[25]  Prior to his recruitment, Plaintiff Fatah was occasionally able to find part-time or temporary work in local factories or manufacturing plants in the city of Bandung in West Java, a province in Indonesia,  where he earned approximately IDR 300 thousand (approximately USD 32) per week.  In or around January 2009, Plaintiff Fatah traveled to the PT Shilla office in Jakarta to apply for work on a commercial fishing vessel.  He submitted his application papers, including his original Seaman's book.

43.     When Plaintiff Fatah submitted his application to PT Shilla, PT Shilla informed him that he would be charged an administrative or recruitment fee of IDR 3.5 million (approximately USD 372).  In exchange, PT Shilla promised Plaintiff Fatah a fisherman position where he would earn USD 300 per month as a base salary, plus a guaranteed bonus of USD 10 per ton of fish caught.  PT Shilla also informed Plaintiff Fatah that he would be eligible for periodic performance based increases.

---

[25] As the primary recording method for a fisherman's work history and performance, the Seaman's book is crucial to establishing reliability and obtaining future employment.

COMPLAINT

44.     Despite the high recruitment fee, Plaintiff Fatah believed that this was finally his opportunity to accomplish his goal of becoming a fisherman and earning a decent living.  Several weeks later, PT Shilla called Plaintiff Fatah and told him that he would be departing soon and needed to pay the recruitment fee of USD 372.  This fee was a large amount of money for him, and Plaintiff Fatah had to sell all of his inheritance, comprised of one third of his mother's rice field.

45.     In early August, PT Shilla called Plaintiff Fatah and informed him that it had found a position for him on board the Knowledge, and that his departure was scheduled for approximately August 17, 2009.  Plaintiff Fatah was relieved and readily agreed, as he had already paid the non-refundable recruitment fee and was counting on employment through PT Shilla.

**Plaintiffs' Departure Process and Journey to the Sea Queen II**

46.     Plaintiffs both arrived at the PT Shilla office prior to their departure, as instructed by PT Shilla.  Plaintiffs were joined by four other Indonesian men who had also signed up for jobs in the commercial fishing industry.

47.     A representative from PT Shilla met with Plaintiffs to go over the five-page employment agreement for the first time.  The contract provided that Plaintiffs would be employed as a tuna fisherman for two years on the Knowledge.  The contract promised Plaintiff Sorihin a base salary of USD 350 per month in the first year and USD 400 in the second year, and Plaintiff Fatah a base salary of USD 300 per month and USD 350 in the second year; both Plaintiffs were also guaranteed a bonus of USD 10 per ton of fish per trip.  The agreement identified the employer in the contract as PT Shilla, on behalf of World Agent Enterprises, Inc., Santiago's business venture.

48.     Unexpectedly, PT Shilla demanded that Plaintiffs sign a second, separate contract, which imposed a penalty of IDR 10 million (approximately USD 1,064) if Plaintiffs failed to complete their two-year terms.  Plaintiffs had no prior notice of this penalty, and were shocked and concerned because of its excessive amount.  Plaintiff Sorihin complained to PT Shilla, as he had not previously signed a penalty contract when he worked on Japanese vessels.  PT Shilla simply responded that their policy was that everyone sign the agreement.  Because they had already paid substantial, non-refundable recruitment fees, prepared for their departures, and completed the recruitment process, Plaintiffs were compelled to sign the contracts.

11                                                      Case No.:

COMPLAINT

49.     Plaintiffs stayed in the PT Shilla office overnight prior to their departure.  During this time, Plaintiffs and the other recruits slept on chairs or on the floor, and occasionally went out to purchase food.

50.     Prior to departing, PT Shilla gave Plaintiff Sorihin a sealed envelope, with instructions to deliver the envelope directly to Santiago.  PT Shilla advised Plaintiff Sorihin to be careful with the envelope because it contained cash in the amount of USD 200 per person, or USD 1,200 total.  PT Shilla also gave Plaintiff Sorihin a telephone number at which to contact Santiago in Hawaii.

51.     On or about August 17, 2009, Plaintiffs departed from Jakarta, Indonesia, and took a series of flights to Singapore, Sydney, Fiji, and finally to Western Samoa, where they took a small plane into American Samoa.  In Sydney, Plaintiffs and the other PT Shilla recruits were joined by two other Indonesian men who were also on route to work on the Knowledge.

52.     In American Samoa, Plaintiffs were picked up at the airport and taken to a dock, where they boarded a vessel that was broken and stationary.  Plaintiffs and the six others were left to live and sleep on this boat for approximately four days, while they waited for the Knowledge to dock. During the time, four Filipinos also arrived and stayed on the same vessel, while waiting for the Knowledge.  Food was only delivered one time per day, and Plaintiffs and the others had to beg local fishermen for extra fish to eat.

53.     After a few days, the Knowledge arrived and docked next to the broken vessel.  The Knowledge flew a U.S. flag.

54.     The group of eight Indonesians, including Plaintiffs, and four Filipinos boarded the Knowledge.  Plaintiffs knew this was far in excess of the number of crew typically needed on a fishing vessel of that size.

55.     The Knowledge was extremely overcrowded.  Only four crewmembers were identified as fishermen for the Knowledge and were required to work.  Plaintiffs were forced to sleep outside on the deck, with only a plastic sheet to protect them from the elements.  The sheet did not protect them from the bitter cold, strong ocean winds, and water, and Plaintiffs both became sick from this exposure.

COMPLAINT

56.     After several days at sea, Do made an announcement to Plaintiffs and the other men that they would be transferred to other fishing vessels.  Do informed Plaintiffs that they would be transferred to the Sea Queen II.  Plaintiffs heard that other recruits were going to other vessels, including the Sea Dragon and Kimmy. This was the first Plaintiffs had ever heard of the Sea Queen II, which caused them great concern, as they had agreed to work on the Knowledge in their employment contracts.  Further, Plaintiffs were warned by the Filipino fishermen that the Sea Queen II was known to be an undesirable vessel to work on and that the captain was strict, stingy, and mean.  Despite their concerns, Plaintiffs had no choice.  They were on the Knowledge, at an unknown location in the middle of the Pacific Ocean, without any land nearby or any capacity to call anyone for help.

57.     Plaintiffs remained on board the Knowledge for approximately eleven days, until the Knowledge moored "skin-to-skin" with the Sea Queen II at an unknown location in the Pacific Ocean.  In rough waters, Do directed Plaintiffs to board a small dinghy and to pull themselves over to the Sea Queen II by a rope connecting the two vessels.  Plaintiffs were, therefore, transferred against their will – and, contrary to the terms of the employment agreement they had signed.

58.     Upon information and belief, Defendant Nguyen knowingly participated in the scheme to obtain Plaintiffs' labor and services from Santiago and Do.  Defendant Nguyen's participation in this trafficking scheme resulted in his obtaining Plaintiffs for forced labor.

**Plaintiffs Are Forced to Work on the Sea Queen II**

59.     Plaintiffs were physically confined on board the Sea Queen II where they were required to perform dangerous work for up to 20 hours per day.  Although Plaintiffs faced miserable working conditions and violations of the agreement they signed, they could not leave.

60.     Plaintiffs' work on board the Sea Queen II began with approximately two months fishing for tuna in warm waters and docking twice in Honolulu, Hawaii (hereinafter "Hawaii fishing operations").  Subsequently, Plaintiffs worked approximately six months fishing primarily for swordfish in cold waters and docking three times in San Francisco, California (hereinafter "California fishing operations").

///

COMPLAINT

**Harsh and Abusive Conditions Aboard the Sea Queen II**

61.    Almost immediately, Plaintiffs discovered that conditions aboard the Sea Queen II, under the control of Defendant Nguyen, were harsh and difficult.

62.    Upon Plaintiffs' arrival on the Sea Queen II, Defendant Nguyen immediately took possession of Plaintiffs' passports and Seaman's books, knowing that these were Plaintiffs' only identification and method of obtaining future employment, respectively.  Plaintiffs did not have any access to their documents.

63.    Defendant Nguyen verbally attacked Plaintiffs, regularly yelling and cursing at them, calling them such things as "dirty" and "mother fucker."  Defendant Nguyen's volatile temper and yelling frightened Plaintiffs, and they felt intimidated and powerless while on the Sea Queen II.

64.    Defendant Nguyen also told Plaintiffs that they had to work hard on his vessel because he had spent a lot of money – specifically USD 6,000 – to obtain them.  Plaintiffs understood this as a threat.  When Plaintiff Sorihin asked to leave the boat, Defendant Nguyen told Sorihin that he could not leave unless he paid Defendant Nguyen back the USD 6,000, in effect requiring Sorihin to buy his freedom.  Defendant Nguyen knew that Sorihin did not have that kind of money.

65.    After the first few weeks, Defendant Nguyen recognized that Plaintiff Fatah was not as experienced as Plaintiff Sorihin.  Defendant Nguyen threatened Plaintiff Fatah, in Sorihin's presence, that if his performance did not improve, he would be fired and would have to pay his own way home.  These threats became a regular occurrence. Plaintiff Fatah was in a constant state of fear of being fired and sent home at his own expense, where he would face an insurmountable penalty with PT Shilla and have no means to repay it.

66.    The physical conditions on the boat were also harsh, dangerous and further demoralizing.  Defendant Nguyen refused to provide Plaintiffs with adequate protective equipment, such as boots, raincoat, waterproof pants, and gloves.  The items provided had tears and holes, which allowed water to enter and made it freezing cold.  Defendant Nguyen had new protective gear available on the vessel but only offered to provide it to Plaintiffs at a cost.

///

COMPLAINT

67.     Although there was an indoor toilet, Defendant Nguyen required crewmembers to urinate and defecate on the deck in a bucket.  Plaintiffs, as Indonesians from a modest Muslim culture, were embarrassed and humiliated to perform their private functions out in the open.  Plaintiffs could only use the indoor toilet when the vessel docked in San Francisco, where the deck was visible to the public.

68.     The crewmembers were also required to shower on the deck in front of others, again, to the embarrassment and humiliation of Plaintiffs.  Plaintiffs could only use the indoor shower during the California fishing operations, when it was too cold outside.

69.     During the second tuna fishing trip in Hawaii, Defendant Nguyen brought on board three adult nephews from Vietnam to work on board the Sea Queen II.  Emboldened by their preferential treatment as family members of the captain, the nephews joined in and escalated the abusive treatment of Plaintiffs, including name-calling and physical abuse.  Defendant Nguyen's nephews routinely awakened Plaintiffs by kicking their shoulders, despite Plaintiffs' objections, and slapped Plaintiffs on the head on several occasions, including in Defendant Nguyen's presence.  Defendant Nguyen tacitly condoned such abusive behavior.  Both of these repeated actions were extremely offensive to Plaintiffs, because in Indonesian culture the foot is considered unclean, and the head is considered sacred and not to be touched.

70.     Throughout their time on the Sea Queen II, Plaintiffs performed physically demanding work for extraordinarily long hours, under Defendant Nguyen's control, with little time for sleep.  These conditions exhausted Plaintiffs and impacted their health and safety, causing them to experience injuries and health problems.

71.     Plaintiff Sorihin sustained a series of serious injuries while under Defendant Nguyen's control.  His injuries included: a permanent injury to his thumb when it was crushed by the machine rolling in the fishing line; an injury to his shoulder when a metal fishing rod broke and hit his shoulder; an injury to his face near his right eye when his face was sliced by the spine of a swordfish being pulled aboard the ship; and an injury to his finger when it was caught in a fishing line while Plaintiff Sorihin was landing a large shark by himself.

///

COMPLAINT

72.     Defendant Nguyen knowingly refused to provide adequate medical care for these injuries despite their severity.  For example, in response to his repeated requests for treatment for his finger, Plaintiff Sorihin was told that he could not seek medical attention off the boat.  Plaintiff Sorihin was required to continue working even while he was in severe pain from his injuries.

73.     Plaintiff Fatah also sustained injuries while under Defendant Nguyen's control.  Because the protective gear that he was given had holes and tears, Plaintiff Fatah had no insulation against the cold water and winds, and regularly experienced cramping and numbness due to prolonged exposure to cold water and temperatures.

74.     Plaintiffs' work conditions and lack of access to medical care or safety equipment made it clear that Defendant Nguyen had an absolute disregard for Plaintiffs' well-being and safety.

**Hawaii Fishing Operations**

75.     For approximately the first two months, the Sea Queen II fished in warm waters around Hawaii for tuna.  During this time, Plaintiffs typically worked seven to eight hour shifts with only a three to four hour break between shifts for food and sleep, under Defendant Nguyen's control.

76.     The Sea Queen II docked in Honolulu twice for approximately four to six days on each occasion.  The dock area in Honolulu was fenced in and monitored by a guard, and Defendant Nguyen stayed on the Sea Queen II even while it was docked at the port.  Therefore, Plaintiffs were unable to leave the port.  While docked, Plaintiffs' work duties included unloading the fish and cleaning out the boat.

77.     The first time that the Sea Queen II docked in Honolulu, Santiago visited Plaintiffs near the boat to introduce himself and to retrieve the envelope of money from PT Shilla.  Plaintiffs understood that Santiago was receiving this payment because he had arranged for their employment on the Sea Queen II.

78.     Plaintiffs received their first wages payment shortly after Santiago's visit.  However, Defendant Nguyen only paid USD 350 to Plaintiff Sorihin and USD 300 to Plaintiff Fatah, even though Plaintiffs had already fished several tons of fish and were entitled to their guaranteed per ton bonus payment per the terms of their employment contract.  Plaintiff Sorihin showed Defendant Nguyen the contract he had signed, which provided for a guaranteed bonus of USD 10 per ton of fish

COMPLAINT

– a significant portion of his compensation.  Defendant Nguyen told Plaintiffs that he had not signed any contract to give them a guaranteed bonus and that he was not bound by their contract.

79.    The Sea Queen II returned to sea for several weeks of tuna fishing, and then returned again to the dock in Honolulu.  During this stop, Plaintiffs again asked Defendant Nguyen to pay them their bonus, as they calculated that they had brought in approximately 50 tons of fish, which should have resulted in a guaranteed bonus of USD 500.  Again, Defendant Nguyen refused.

80.    As a result, Plaintiffs were paid significantly less than what was promised to them in their employment agreements.  Plaintiffs had signed employment agreements and paid large recruitment fees in reliance on the promised compensation.

**California Fishing Operations**

81.    After the second docking in Honolulu, Defendant Nguyen informed his crew that they would be heading to San Francisco and fishing for swordfish (and occasionally shark fin) in cold waters.  Plaintiffs understood they would only be fishing for tuna and were extremely concerned about fishing for swordfish.  Plaintiffs did not have any experience with fishing for swordfish.  Plaintiffs, however, knew – as Defendant Nguyen, an experienced captain, must have known – it was much harder and more dangerous work due to the swordfish's spine and larger size.

82.    The Sea Queen II, and Plaintiffs, fished for swordfish for approximately two months while en route to San Francisco.  Plaintiffs' work conditions became considerably worse.  On a daily basis, they regularly worked a 12-hour-shift followed by an 8-hour-shift, under Defendant Nguyen's control, with their only free time comprising of a thirty-minute break for food and three to four hours for sleep.  Plaintiffs regularly worked in cold weather conditions and rough seas, making their work more difficult, dangerous, and exhausting.

83.    Upon arriving in San Francisco, the Sea Queen II docked at Pier 45 for approximately one week before returning to sea.  During this time, Defendant Nguyen visited his home in San Jose.  Before leaving, Defendant Nguyen threatened Plaintiffs not to set foot off the vessel, or they would be jailed.  While Defendant Nguyen was gone, he left his nephews on board and in charge of the Sea Queen II, and they kept an eye on Plaintiffs.  While docked, Plaintiffs' work duties included unloading the fish and cleaning out the boat.

Case No.:

COMPLAINT

84.    The Sea Queen II returned to sea to engage in fishing operations twice more, for approximately forty to forty-five days on each trip, and docked in San Francisco on two more occasions for approximately one week.  Plaintiffs were finally able to make their escape during the third docking in San Francisco.

**Plaintiffs' Escape**

85.    Plaintiffs did not have landing permits or any type of immigration authorization to be in the U.S.  Plaintiffs were scared that they would be deported if they left the Sea Queen II.  Defendant Nguyen told Plaintiffs that they were prohibited from leaving the vessel in San Francisco, or they would be arrested.  When they signed their employment contracts, however, Plaintiffs were not informed that they would be unable to leave the vessel for the period of two years.  Had they known this, both would never have agreed to the terms of the employment.

86.    Further, Plaintiffs were unaware of a way they could make a meaningful complaint about their conditions on board the Sea Queen II.  Plaintiff Sorihin attempted to contact PT Shilla in Jakarta on several occasions, but was unable to reach anyone.  They were isolated on board, and Plaintiff Sorihin only spoke limited English, while Plaintiff Abdul spoke even less English than Sorihin did.

87.    Defendant Nguyen told Plaintiffs that if Plaintiffs wanted to leave, they would have to repay Defendant Nguyen the more than USD 6,000 he had spent to acquire Plaintiffs, in effect requiring them to buy their freedom.  Defendant Nguyen knew that the men did not have that kind of money in their possession.  In addition, Plaintiffs would have to pay their own way home, which Plaintiffs estimated at more than USD 1,000.

88.    Plaintiffs believed that they had no viable option to resign from their positions and terminate their contracts.  Furthermore, Plaintiffs knew that if they terminated their employment and went back to Indonesia, they would incur the IDR 10 million breach of contract penalty.  The serious financial harm made any prospect of returning home before the end of their contracts impossible.

89.    Further, they would experience severe reputational harm if they terminated their contracts and returned home to Indonesia.  Namely, Plaintiffs would have a reputation as fishermen

COMPLAINT

who broke their contracts and, as a consequence, would have difficulty obtaining future employment.

90.    Conditions aboard the Sea Queen II, however, made Plaintiffs increasingly desperate. After severely injuring his thumb, Plaintiff Sorihin told Defendant Nguyen that he wanted to leave the ship because of the terrible working conditions.  Defendant Nguyen said no.

91.    Plaintiffs could not buy their freedom; they could not afford to pay Nguyen USD 6,000, each, and they could not afford the total sum of all the costs and penalties they would incur if they left early.

92.    Plaintiffs' increasing desperation and fear, however, led them to see escape as the only option.  Plaintiffs understood based on Defendant Nguyen's threats that they would likely be arrested if they attempted to leave the Sea Queen II.  Despite the threats, Plaintiffs believed that they would die on board the Sea Queen II unless they were able to escape.

93.    On or about April 6, 2010, while docked in San Francisco, Defendant Nguyen and his son, Tony, Defendant Nguyen's right-hand man on board the Sea Queen II, left the ship and went home to San Jose.  Defendant Nguyen's nephews remained on board and drank heavily.  After the nephews fell asleep, Plaintiff Sorihin located and retrieved from Tony's room his and Plaintiff Fatah's passports and Seaman's books.  With their passports and Seaman's books, Plaintiffs then escaped from the Sea Queen II.

94.    At the time of their escape, Plaintiffs exhibited several signs of the hardship they had experienced.  In addition to being sad, anxious and fearful, Plaintiffs were unhealthy, emaciated, sunburned, and Plaintiff Sorihin's hand was badly swollen from a prior injury.

95.    Since their escape from the Sea Queen II, Plaintiffs experienced a period of isolation and cultural and linguistic adjustment and to this day suffer ongoing psychological trauma as a result of their time on the Sea Queen II.

///

///

///

///

COMPLAINT

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

**Violations of the Trafficking Victims Protection Reauthorization Act ("TVPRA")**

**18 U.S.C. § 1595**

96.     Plaintiffs re-allege and incorporate by reference the allegations set forth above as if fully set forth here.

97.     Plaintiffs are victims of slavery, peonage, forced labor, involuntary servitude and human trafficking in violations of Title 18 U.S.C. §§ 1581, 1582, 1584, 1589, 1590, 1592 and 1593A.

98.     Plaintiffs were especially vulnerable because they were not fluent English speakers and did not know anyone in the United States who could help them.  Plaintiffs also were especially vulnerable because of their limited education, humble backgrounds, lack of immigration status, and because of the large recruitment fees that they paid.  Further, Plaintiffs were at sea for most of the relevant time period, without any way of communicating with anyone who could help them or any means of requesting assistance.  During the limited periods when they were in dock, Plaintiffs remained vulnerable because they were in a fenced-in dock and/or were watched by Defendant Nguyen and/or his agents or family members.

99.     Plaintiffs also were rendered vulnerable by Defendant Nguyen's confiscation and possession of their passports and Seaman's books.  As their primary identification in a foreign country, Plaintiffs felt they could not leave the vessel without their passports.  Without their Seaman's books, Plaintiffs feared – and Defendant Nguyen knew or must have known – that they would be unable to obtain future employment if they attempted to leave the Sea Queen II.

100.     Defendant Nguyen knowingly harbored, transported, and obtained the Plaintiffs for labor or services by means of violations of Title 18, Chapter 77.  Defendant Nguyen required Plaintiffs to perform hazardous work up to 20 hours per day, without proper protective gear, causing them to suffer injuries and illness.  Defendant Nguyen also knew that Plaintiffs had signed an employment contract that provided for guaranteed bonuses.  Yet, Defendant Nguyen refused to pay Plaintiffs their contractual bonuses.  When Plaintiffs sought to leave the Sea Queen II, they were told

they would have to buy their freedom, repaying Defendant Nguyen the money he had spent to acquire them as well as their own return travel costs, making it impossible for Plaintiffs to leave. Defendant Nguyen also ensured that Plaintiffs did not leave the guarded dock area in Honolulu and threatened that they would be jailed if they left the vessel in San Francisco.

101.    Defendant Nguyen obtained the labor and services of Plaintiffs by force, threats of force, threats of serious harm and/or physical restrain against Plaintiffs.  During most of the time they were on the Sea Queen II, Plaintiffs were at sea, where they could not leave or contact anyone for assistance.  During the limited periods when the boat was docked, Plaintiffs were restrained from leaving because they were confined to a fenced dock area and/or watched by Defendant Nguyen or his relatives or agents.

102.    Defendant Nguyen obtained the labor and services of Plaintiffs by means of the abuse or threatened abuse of law or legal process.  Defendant Nguyen kept Plaintiffs' passports and Seaman's books, knowing they were their only identification and method of obtaining future employment, respectively, further restricting Plaintiffs' ability to leave the Sea Queen II.  Plaintiffs were afraid to flee without their passports and Seaman's books.  Further, Defendant Nguyen told Plaintiffs that they would be jailed if they tried to leave.  Defendant Nguyen knew that Plaintiffs were undocumented and would be afraid to flee the Sea Queen II in the United States.

103.    Defendant Nguyen obtained the labor and services of Plaintiffs by means of a scheme, plan or pattern intended to cause the Plaintiffs to believe that, if they did not perform such labor or services, that they would suffer serious financial and reputational harm.  As described above, Defendant Nguyen told Plaintiffs that they could leave only if they repaid him the money he had spent to acquire them – money Defendant Nguyen knew they did not have.

104.    Defendant Nguyen held Plaintiffs in a condition of involuntary servitude.  As described above, Plaintiffs provided labor involuntarily to the benefit of Defendant Nguyen, who paid them only the low monthly salary for nearly around-the-clock labor.

105.    Defendant Nguyen knowingly held Plaintiffs in a condition of peonage.  As described above, Defendant Nguyen told Plaintiffs that they would have to pay Defendant Nguyen the money he had spent to acquire them if they wanted to leave his employment.  Defendant Nguyen knew they

1  could not afford to buy their freedom, and so the only way they could repay the money Defendant

2  Nguyen demanded was by continuing to working it off.

3      106.    As the owner of the Sea Queen II, Defendant Nguyen equipped, loaded, and sent the

4  Sea Queen II from a port in the United States for the purpose of procuring Plaintiffs, both of whom

5  are from a foreign country, to be held to service or labor on his vessel.

6      107.    As the owner and member of the crew of the Sea Queen II, Defendant Nguyen also

7  transported and detained Plaintiffs on his vessel.  Defendant Nguyen received, confined, detained,

8  and transported Plaintiffs, forbidding them from leaving the vessel until they repaid the money he

9  had spent to acquire them – literally, buying their freedom.

10      108.    Defendant Nguyen also transported Plaintiffs from the United States.  Although

11  Defendant Nguyen initially received Plaintiffs at sea, Defendant Nguyen later docked with Plaintiffs

12  in Hawaii and California and then carried them away from the United States and back to sea with the

13  knowledge and intent to hold them captive.

14      109.    Defendant Nguyen confiscated, removed, concealed, and possessed Plaintiffs'

15  passports and Seamen's books in the course of these violations.  Defendant Nguyen withheld

16  Plaintiffs' only identification and method of obtaining future employment in order to maintain the

17  labor and services of Plaintiffs, who are victims of a severe form of trafficking in persons.

18      110.    Defendant Nguyen knowingly benefitted from participation in a venture that

19  Defendant Nguyen knew or should have known was engaged in peonage, slavery, forced labor,

20  involuntary servitude, unlawful conduct with respect to documents, and human trafficking.

21  Defendant Nguyen received financial benefit from his participation in the venture by obtaining

22  cheap, nearly around-the-clock labor.

23      111.    As a result of the conduct of Defendant Nguyen and his agents, Plaintiffs have

24  suffered damages in an amount to be determined at trial.

25      112.    Plaintiffs are entitled to recover damages and reasonable attorneys' fees for the

26  wrongful conduct of Defendant Nguyen and his agents.

27  ///

28  ///

COMPLAINT

**SECOND CLAIM FOR RELIEF**
**Alien Tort Statute ("ATS")**
**28 U.S.C. § 1350**

113.    Plaintiffs re-allege and incorporate by reference the allegations set forth above as if set forth fully here.

114.    Plaintiffs are defined by statute as aliens.

115.    Defendant's actions as set forth above constitute the torts of trafficking in persons, involuntary servitude, slavery, and/or forced labor in violation of the law of nations and/or in violation of treaties of the United States.

116.    The law of nations, including customary international law, is reflected, expressed and defined in multilateral treaties and other international instruments, international and domestic judicial decisions, and other authorities.  These include, but are not limited to, the Protocol to Prevent, Suppress, and Punish Trafficking in Persons, Nov. 15, 2000, G.A. Res. 55/25, Annex II to the United Nations Convention Against Transnational Organized Crime, U.N. GAOR Supp. (No. 49), U.N. Doc. A/45/49 (Vol. I) (2001); Convention Concerning the Abolition of Forced Labor, June 25, 1957, 320 U.N.T.S. 291; Supplemental Convention on the Abolition of Slavery, the Slave Trade and Institutions and Practices Similar to Slavery, Sept. 27, 1956, 266 U.N.T.S. 3; Convention for the Suppression of the Traffic in Persons and of the Exploitation of the Prostitution of Others (1951); Convention Concerning Forced or Compulsory Labour, June 28, 1930, 39 U.N.T.S. 55; Convention to Suppress the Slave Trade and Slavery (1926); Universal Declaration of Human Rights, G.A. Res. 217A (Ill.), U.N. Doc. A/810, at 71 (1948); the International Covenant on Civil and Political Rights, Dec. 19, 1966, 999 U.N.T.S. 171, 61 I.L.M. 368; and the International Labour Organisation (ILO) on Fundamental Principles and Rights at Work, International Labour Conference (ILC) 86th Sess., June 19, 1998, § 2(c), 37 I.L.M 1233.

117.    As alleged above, Defendant engaged in and/or is responsible for acts, including by his agents, that constituted the recruitment, transportation, transfer, harboring or receipt of Plaintiffs. These acts were conducted by means of the threat or use of force or other means of coercion, abduction, fraud, deception, and the abuse of power or a position of vulnerability.  The acts were taken for the purpose of exploitation, including for the purposes of obtaining labor and services from

**COMPLAINT**

1  Plaintiffs. Defendant benefitted from the trafficking by obtaining and profiting from low-cost labor,

2  at the expense of Plaintiffs.

3       118.    Plaintiffs suffered injuries and damages as a result of these actions by Defendant.

4       119.    As set forth in detail above, Plaintiffs' claims touch and concern the territory of the

5  United States because the conduct alleged occurred in U.S. waters and at ports in the United States,

6  including in Hawaii and California.  Moreover, the conduct alleged undertaken for the purpose of

7  fishing for seafood for sale to U.S. consumers.  By using trafficked, slave and forced labor,

8  Defendant was able to keep costs low, thereby putting him at a competitive advantage in the U.S.

9  market.

10       120.    Plaintiffs' claims also touch and concern the territory of the United States because

11  Defendant is a national and/or resident of the United States.  In addition, Plaintiffs were forced to

12  work on a fishing vessel registered with the U.S. Coast Guard.

13       121.    As a result of Defendant's conduct, Plaintiffs have suffered damages in an amount to

14  be determined at trial.

15       122.    Plaintiffs are entitled to damages for the wrongful conduct of Defendant.

16  **PRAYER FOR RELIEF**

17  WHEREFORE, Plaintiffs pray this Court for an order:

18  1.    Entering judgment in favor of each of the Plaintiffs on all counts of the Complaint;

19  2.    Awarding each of the Plaintiffs monetary damages, subject to proof and in an amount

20  to be determined at trial, including but not limited to fees and costs paid, debts incurred, and

21  compensation promised but not paid;

22  3.    Awarding each of the Plaintiffs consequential damages, including but not limited to

23  the loss of assets and of educational and business opportunities as a result of Defendant's illegal

24  conduct;

25  4.    Awarding each of the Plaintiffs damages for the mental anguish and pain and

26  suffering Plaintiffs experienced as a result of being trafficked and forced to labor against their will;

27  5.    Awarding each of the Plaintiffs punitive and exemplary damages;

28

1      6.     Awarding Plaintiffs any and all other damages allowed by law according to proof to

2  be determined at time of trial in this matter;

3      7.     Awarding Plaintiffs reasonable attorneys' fees and costs; and

4      8.     Awarding such other relief as the Court deems just and equitable.

## JURY DEMAND

Plaintiffs respectfully demand a trial by jury of all issues for which they have a right to demand a trial by jury.


Dated:  September 22, 2016          Respectfully Submitted,


LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER


By:  /s/  Mana Barari
     Mana Barari
     Carole Vigne


Agnieszka Fryszman
COHEN MILSTEIN SELLERS & TOLL PLLC


Yenny Teng-Lee
THE LAW OFFICE OF YENNY TENG-LEE


*Attorneys for Plaintiffs*